16    *Clark Regional Med. Ctr., et al. v.*    No. 01-5658
    *Dep't of Health and Human Servs.*

the regulation to exclude swing and observation beds is arbitrary, capricious, and otherwise not in accordance with the law.

## III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0421P (6th Cir.)
File Name:  02a0421p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CLARK REGIONAL MEDICAL
CENTER; PATTIE A. CLAY
HOSPITAL,
        *Plaintiffs-Appellees,*

        *v.*

UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN
SERVICES,
        *Defendant-Appellant.*

No. 01-5658

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 99-00465—Karl S. Forester, Chief District Judge.

Argued:  September 13, 2002

Decided and Filed:  December 11, 2002

Before:  BOGGS and COLE, Circuit Judges; BELL, Chief
District Judge.[*]

---

[*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:** Linda S. Wernery, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Appellant. Keith D. Barber, HALL, RENDER, KILLIAN, HEATH & LYMAN, Indianapolis, Indiana, for Appellees. **ON BRIEF:** Linda S. Wernery, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., Frances E. Catron, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, Anthony J. Steinmeyer, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, APELLATE SECTION, Washington, D.C., Howard H. Lewis, DEPARTMENT OF HEALTH AND HUMAN SERVICES, OFFICE OF THE GENERAL COUNSEL, Atlanta, Georgia, for Appellant. Alan C. Guild, Jr., Sharon K. Hager, HALL, RENDER, KILLIAN, HEATH & LYMAN, Louisville, Kentucky, for Appellees.

———————————

**OPINION**

———————————

R. GUY COLE, JR., Circuit Judge. This dispute is about whether hospital beds licensed for acute inpatient care, but used for other purposes when not needed by inpatients, may be counted for purposes of a Medicare program designed to reimburse certain hospitals based on the number of available beds. Specifically, the Medicare program, administered by the United States Department of Health and Human Services ("Department"), provides for a supplemental payment to be made to "disproportionate share" hospitals. Disproportionate share hospitals are hospitals located in certain areas, which provide a qualifying percentage of their services to low-income patients. Whether a hospital is eligible for this payment is based in part on the number of beds it has available for inpatient care. The plaintiffs in this case are two

an incentive to *exclude* beds in the IME calculation, because they get a greater subsidy with a smaller number of beds. *See Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala*, 165 F.3d 1162, 1164 (7th Cir. 1999). Conversely, a hospital has an incentive to *include* beds in the DSH calculation because it then becomes easier for the hospital to meet the low-income patient threshold. *See* 42 U.S.C. § 1395ww(d)(5)(F). The Department's analysis of the different incentives is correct, but ultimately does not render its decision in this case less arbitrary or less capricious. Implicit in the Department's argument is that the counting of beds under § 412.105(b) for purposes of the DSH adjustment should be construed so as to offer the least advantage to the hospital. This construction is plainly at odds with the purpose of 42 C.F.R. § 412.106(a)(1)(i), which clearly provides that "the number of beds in a hospital is determined in accordance with the § 412.105(b)" (the IME provision), irrespective of whether the hospital is helped or hurt by the bed count. Furthermore, the Department's interpretive rules in PRM § 2405.3(G) were meant to "incorporate[] into a single section existing policy setting forth the method for counting beds." *See Sacred Heart Ctr. v. Blue Cross of Wash.*, HCFA Administrator Dec., (Dec. 21, 1998) *in* CCH Medicare and Medicaid Guide ¶ 80,154. Having clearly coordinated the counting of beds for both the IME and DSH programs, the Department cannot simply interpret the regulation to vary so as to always disadvantage the subject hospital. *Cf. Jewish Hosp., Inc.*, 19 F.3d at 276 (discussing Department's history of hostility to the concept of the DSH adjustment); *Alhambra Hosp.*, 259 F.3d at 1076 n.4 (same).

The Department's decision in this case not to count the disputed beds simply cannot be reconciled with the Department's own regulations and interpretive rules. The plain language of § 412.105(b), and the Department's own interpretation of what constitutes an "available bed" as set out in PRM § 2405.3(G), demonstrate that swing and observation beds should be considered available beds for purposes of the DSH adjustment. As such, the Department's interpretation of

care area of the Plaintiff hospitals. The beds are always staffed and available for acute care inpatients. Swing beds, by definition, can swing immediately from SNF care to acute care if necessary. Similarly, the observation beds at issue were immediately available to admit an observed patient as an inpatient.

Plaintiffs' swing and observation beds are available to be put into use for acute care *if needed*. There is nothing in the language of the PRM that indicates that a bed is "unavailable" simply because it is not exclusively designated for acute inpatient care. Indeed, the language of the PRM indicates that so long as a bed can be put to use for inpatient care – even if that means displacing an SNF or observation patient – it may be counted as an "available bed." There is no evidence in this record to suggest that the swing beds and observation beds in this case were not immediately available for use should an acute care patient need them. As a consequence, the PRM clearly creates a presumption that the beds at issue are to be included in the count of available beds.

Importantly, the PRM explains that "[t]he term 'available bed' as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service." *Id.* The use of acute care beds as swing and observation beds when not being otherwise used for acute care patients is precisely the type of day-to-day fluctuation that should not be captured when counting beds under § 412.105(b). The day-to-day, or perhaps even hour-to-hour, change in the occupancy of these beds does not reflect the overall size of the Plaintiff hospitals, which is what the bed count is intended to capture.

The Department argues that "[t]he IME calculation and the DSH calculation . . . are undertaken for different purposes, and participating hospitals have different incentives vis-a-vis each program." Def. Br. at 32. Specifically, hospitals have

---

Kentucky hospitals, Clark Regional Medical Center ("Clark Regional") and Pattie A. Clay Hospital ("Clay") (together "Plaintiffs"). Plaintiffs allege that the Department arbitrarily and capriciously violated its own regulations for counting beds when it denied them reimbursement based on the provision of medical services to low-income patients. The Department responds that it is entitled to deference in construing its own rules, especially when that construction is the result of an administrative hearing process, as it was in this case. The Department insists that its decision not to count the disputed beds can be reconciled with its promulgated rules, and consequently that this appeal should be dismissed.

Because we find that the Director's interpretation of the applicable regulation arbitrary and capricious, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual and Statutory Background

Plaintiffs are two hospitals located in eastern Kentucky that provide inpatient care to Medicare and low-income patients. Clark Regional is licensed by the Commonwealth of Kentucky for 100 acute care beds. Clay is licensed for 105 acute care beds. Both facilities are also certified by the Department as "swing-bed" facilities, which means that they may, when necessary, use a designated number of acute care beds to provide post-hospital skilled nursing facility ("SNF") care on a temporary basis.[1] Both facilities also use their acute care beds for patient "observation" to determine whether a patient should be admitted to the hospital. Plaintiffs state that

---

[1]A skilled nursing facility or SNF is commonly referred to as a nursing home. In a qualifying swing-bed hospital, the hospital may permit acute beds to "swing" temporarily to SNF care use and then "swing back" to acute care when SNF care is complete. *See* 42 U.S.C. § 1395tt(d) (1994).

during the time at issue they used approximately 10% of their acute care beds for observation and SNF care patients. However, on any given day, the beds at issue were used for observation and for SNF care only when not in use for acute care.

Whether the observation and swing beds were available for acute care patients is critical to whether Plaintiffs receive certain significant benefits under Medicare. Medicare is divided into two parts -- Part A and Part B. Part A covers a large number of inpatient services. Part A provides reimbursement under a cost-control regime called the prospective payment system ("PPS"). In particular, Title VI of the Social Security Amendments of 1983 added § 1886(d) to the Social Security Act establishing PPS for the reimbursement of inpatient hospital operating costs for all items and services provided to Medicare beneficiaries other than physician's services associated with each discharge. Social Security Amendments of 1983, Pub. L. No. 98-21, 97 Stat. 65 (1983). Reimbursement under PPS is based on prospectively determined national and regional rates for each discharge, rather than reasonable operating costs or the hospital's actual costs. 42 U.S.C. § 1395ww(d). Congress implemented PPS to reform the financial incentives faced by hospitals in order to promote efficiency and reward cost-effective hospital practices. H.R. Rep. No. 98-25(I), at 132, *reprinted in* 1983 U.S.C.C.A.N. 219, 351.

Part B is a voluntary insurance program, and covers outpatient care services. Outpatient services include pre-admission "observation" of patients, 42 U.S.C. § 1395x(s)(2)(B), and are excepted from PPS. SNF care beds, although technically categorized under Part A, are also excepted from PPS. *See* 42 U.S.C. § 1395tt; 42 C.F.R. §§ 409.10, 413.114 (1995).

Congress recognized, however, that payment under PPS may not account for the added costs incurred by hospitals that treat a disproportionate number of low-income patients. H.R.

This is because these excluded beds are located in areas of the hospital that, by definition, cannot come within PPS. Had the Department intended to exclude all non-PPS reimbursable beds and services, it could easily have written the regulation to do so.

We do not rely on the plain meaning of § 412.105(b) alone. We emphasize that the Department's regulations clearly contemplate that terms defined for purposes of the IME adjustment are meant to govern the DSH adjustment as well. *See* 42 C.F.R. § 412.106(a)(1)(i). That being the case, even were we to accept the Department's questionable distinction between "bed" and "available bed day" in § 412.105(b), we find the Department's own PRM conclusive proof that swing beds and observation beds are intended to be counted in the tally of "available bed days" in the DSH calculation.

The PRM is "the prototypical example of an interpretive rule issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995). The PRM states that "[t]o be considered an available bed, a bed must be permanently maintained for lodging inpatients." PRM § 2405.3(G). There is no dispute that the 100 or 105 beds in this case were licensed by the state as acute care beds for inpatient services. Therefore, the only question is whether the fact that 10% of these beds serve dual purposes -- acute care service plus SNF care or observation service -- renders them "unavailable."

The PRM explains that to be available, a bed "must be available for use and housed in patient rooms or wards (i.e., no in corridors or temporary beds)." *Id.* The PRM suggests that a bed is available for use when "the hospital puts the beds into use when they are needed[;]" furthermore, "[i]n the absence of evidence to the contrary, beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting year." *Id.* The SNF care and observation beds at issue in this case are located in the acute

*Wash.*, HCFA Administrator Dec., (Dec. 21, 1998) *in* CCH Medicare and Medicaid Guide ¶ 80,154. Plaintiffs argue that the temporary use of its acute care beds for SNF care and observation services constitutes a day-to-day fluctuation of usage, and has no bearing on the absolute size of the facility as contemplated in PRM § 2405.3(G). Finally, Plaintiffs insist that the last sentence of PRM § 2405.3(G) demonstrates that beds are to be included in the count, unless the hospital can show that they should be excluded.

We conclude that the Department's application of its own regulations in this case cannot be squared with either the plain meaning of the regulations or with the Department's definition of "available bed" set forth in PRM § 2405.3(G). As such, we conclude that the HCFA's decision was arbitrary and capricious.

The Department's attempt to distinguish between a "bed" and an "available bed day" is at odds with the plain meaning of § 412.105(b). Section 412.105(b) states that the number of beds is to be determined "by counting the number of available bed days during the cost reporting period, *not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period*." 42 C.F.R. § 412.105(b) (emphasis added). Because the regulation specifically lists certain types of beds that are excluded from the bed count, but does not list swing or observation beds, the plain meaning of the regulation suggests that it is permissible to count swing and observation beds. Further, swing and observation beds are not of the same class or type as "beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units." Although these beds listed as excluded are, as the HCFA concluded, all non-PPS reimbursable beds, the swing and observation beds at issue in this case are actually used for PPS-reimbursable services more often than not. None of the beds described as excluded may be used primarily for acute inpatient care as the swing and observation beds are.

Rep. No. 98-25(I), at 141, *reprinted in* 1983 U.S.C.C.A.N. 219, 360. In particular, Congress found, based on comprehensive analysis of cost data, that "the only hospitals that demonstrated a higher medicare cost per case associated with disproportionate share of low-income patients were urban hospitals with over 100 beds." H.R. Rep. No. 99-241, at 17, *reprinted in* 1986 U.S.C.C.A.N. 594, 595; *cf. Alhambra Hosp. v. Thompson*, 259 F.3d 1071, 1075-76 & n.5 (9th Cir. 2001). Therefore, Congress authorized the disproportionate share hospital adjustment ("DSH adjustment"), 42 U.S.C. § 1395ww(d)(5)(F), which provides additional payment to qualifying hospitals.

To be eligible for this additional payment, a hospital must meet certain criteria concerning its location and bed size. For hospitals in urban areas with 100 or more beds, hospitals must have 15% low-income patients to be eligible for the DSH adjustment. *See* 42 U.S.C. § 1395ww(d)(5)(F)(v)(I). For urban hospitals with fewer than 100 beds, the low-income patient threshold is 40%. *See* 42 U.S.C. § 1395ww(d)(5)(F)(v)(III). It is undisputed that the Plaintiffs qualify as urban hospitals. At issue in this case is how many of the 100 beds at Clark Regional and 105 beds at Clay may be counted toward the 100 beds required to be eligible for the 15% low-income patient threshold.

### B. Procedural Background

Clark Regional qualified for the DSH adjustment for fiscal years 1992 through 1995; Clay qualified for the adjustment for fiscal years 1993 through 1995. In June of 1997, however, the Department's agent, known as a fiscal intermediary, concluded that the method by which it had been counting beds was incorrect. The fiscal intermediary informed Plaintiffs that swing beds and observation beds could no longer be counted as part of the total number of beds for purposes of the DSH adjustment. As a result, both hospitals fell below the 100 beds required for the 15% low-income patient threshold. Because neither hospital met the more stringent 40% low-

income patient requirement, Plaintiffs were no longer eligible for the DSH adjustment. In addition, because Plaintiffs would not have previously qualified for the DSH adjustment without the inclusion of the observation and SNF beds, the fiscal intermediary told Plaintiffs they must return $5,092,243 previously paid to the hospitals by the Department.

Plaintiffs filed an appeal with the Provider Reimbursement Review Board ("PRRB"), an administrative body established to hear disputes between providers and fiscal intermediaries. *See* 42 U.S.C. § 1395oo(a), (h). After conducting a hearing, and reviewing the applicable administrative guidelines, the PRRB concluded that "[t]he [Fiscal] Intermediary did not properly determine that the [Plaintiffs] had less than 100 beds for the fiscal years in question" and reversed the fiscal intermediary's decision.

The Department subsequently appealed the PRRB's decision to the Health Care Financing Administration ("HCFA"). *See* 42 U.S.C. § 1395oo(f). The HCFA reversed, noting that the "HCFA has a longstanding policy of only considering bed days in the bed count if the costs of such days were allowable in the determination of Medicare inpatient costs." Because swing beds and observation beds are not reimbursed for purposes of inpatient services under PPS, the HCFA reasoned that the counting of beds for purposes of the DSH adjustment should be limited to beds "which are recognized as part of the PPS hospital's inpatient operating costs."

Plaintiffs filed suit in the United States District Court for the Eastern District of Kentucky seeking review of the HCFA's decision. *See* 42 U.S.C. § 1395oo(f). Plaintiffs argued that the HCFA's decision was arbitrary and capricious because, among other things, it violated the Department's own rules on how to count beds for purposes of the DSH adjustment. Specifically, Plaintiffs alleged that the Department's interpretation of 42 C.F.R. § 412.105(b), which governs the counting of beds for purposes of the DSH

including beds in intensive care units, coronary care units, neonatal intensive care units and other special care inpatient hospital units. Beds in the following locations are excluded from the definition: hospital-based skilled nursing facilities or in any inpatient area(s) of the facility not certified as an acute care hospital, labor rooms, PPS excluded units such as psychiatric or rehabilitation units, post anaesthesia or postoperative recovery rooms, outpatient areas, emergency rooms, ancillary departments, nurses' and other staff residences, and other such areas as are regularly maintained and utilized for only a portion of the stay of patients or for purposes other than inpatient lodging.

To be considered an available bed, a bed must be permanently maintained for lodging inpatients. It must be available for use and housed in patient rooms or wards (i.e., not in corridors or temporary beds). Thus, beds in a completely or partially closed wing of the facility are considered available only if the hospital put the beds into use when they are needed. The term "available bed" as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service.

In the absence of evidence to the contrary, beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting period. The hospital bears the burden of proof to exclude the beds from the count.

PRM § 2405.3(G).

Plaintiffs point to language in an HCFA administrative decision that this provision is meant to "incorporate[] into a single section existing policy setting forth the method for counting beds." *See Sacred Heart Ctr. v. Blue Cross of*

42 C.F.R. § 412.105(b) (1995).

The Department contends that this regulation is ambiguous because it provides no specific definition for an "available bed day." In the Department's view, there is an important distinction between a "bed" and an "available bed day" in the regulation. The specific exclusions listed -- nursery bassinets and beds, custodial care beds, and beds in excluded units -- apply only to the regulatory definition of a "bed." An "available bed day," on the other hand, clearly excludes the specified beds, but is silent on whether other categories of beds – i.e., swing and observation beds – should be counted or excluded. The Department concludes that, as there is no clear guidance from the regulation as to whether days in which beds are used for SNF patients or for observation should be counted as an "available bed day," we should defer to the Department's interpretation of the regulation. *See Thomas Jefferson Univ.*, 512 U.S. at 512.

Plaintiffs respond that the Department's "bed" and "available bed day" distinction strains the plain meaning of the regulation. Plaintiffs respond that under the principle of statutory interpretation *ejusdem generis* ("of the same kind"), the listing of the beds to be excluded from the count restricts the class of excluded beds only to those specifically listed. Therefore, unless specifically listed as an exclusion, any other bed should be implicitly included in the definition.

Moreover, Plaintiffs contend that the Department's construction of the regulation is at odds with other rules the Department has promulgated. Specifically, Plaintiffs allege that the Department's interpretation of the regulation conflicts with its detailed definition of beds for purposes of the IME adjustment in the PRM:

> A bed is defined for this purpose as an adult or pediatric bed (exclusive of beds assigned to newborns which are not in intensive care areas, custodial beds, and beds in excluded units) maintained for lodging inpatients,

adjustment, was arbitrary and capricious because it did not comport either with the language of the regulation itself, or the Department's "Provider Reimbursement Manual," which clarifies how to count beds.

The district court agreed, finding that (1) the "plain meaning" of 42 C.F.R. § 412.105(b) required that all beds not specifically excepted should be counted in the eligibility calculation; (2) HCFA's own Provider Reimbursement Manual ("PRM") guidelines supported the inclusion of those beds in the eligibility count; and (3) the HCFA had impermissibly shifted the burden of proof onto the hospital to show that the beds should be included in the count. The Director now appeals.

## II. DISCUSSION

### A. Standard of Review

An agency is obliged to interpret its implementing legislation in a reasonable manner and may not make findings or promulgate regulations in a manner that is arbitrary or capricious in substance, or manifestly contrary to the statute. *See* 5 U.S.C. § 706(2)(A); *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).

The Supreme Court has established a two-step process for reviewing an agency's interpretation of a statute that it administers. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). "First, always, is the question whether Congress has directly spoken to the *precise question at issue*. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 273 (6th Cir. 1994) (emphasis in original) (citing *CenTra, Inc. v. United States*, 953 F.2d 1051 (6th Cir. 1992)). The Supreme Court has explained that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions

which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9.

Second, if we determine that Congress has not directly addressed the precise question at issue, that is, that the statute is silent or ambiguous on the specific issue, we must determine "whether the agency's answer is based on a permissible construction of the statute." *Jewish Hosp., Inc.*, 19 F.3d at 273. In assessing whether the agency's construction is permissible, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [we] would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 273-74 (citing *Chevron*, 467 U.S. at 843 n.11). In fact, the agency's construction is entitled to deference unless "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

Our review of an agency's interpretation of its own regulations is highly deferential. Pursuant to 42 U.S.C. § 1396oo(f)(1), a decision by the HCFA is subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Under the APA, we review an agency decision to see whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Under the APA, an agency's interpretation of a regulation must be given controlling weight unless it is "plainly erroneous or inconsistent with the regulation." *Id.*

## B. Analysis

Congress has not explicitly addressed the question of whether swing and observation beds should be included in the count of beds in determining whether a hospital qualifies for the DSH adjustment. As described above, the applicable version of 42 U.S.C. § 1395ww(d)(5)(F)(v) stated in pertinent part:

In this subparagraph, a hospital "serves a significantly disproportionate number of low income patients" for a cost reporting period if the hospital has a disproportionate patient percentage . . . for that period which equals, or exceeds--

(I) 15 percent, if the hospital is located in an urban area and has 100 or more beds . . . .

(III) 40 percent, if the hospital is located in an urban area and has 100 or more beds . . . .

42 U.S.C. § 1395ww(d)(5)(F)(v) (1994).

However, it is not disputed that the regulations at issue, 42 C.F.R. §§ 412.106(a)(1)(i), 412.105(b), constitute a permissible construction of § 1395ww(d)(5)(F)(v). *See Chevron*, 467 U.S. at 844. At issue in this case, therefore, is whether the Department properly interpreted and applied its own regulations in determining Plaintiffs' eligibility for the DSH adjustment. Accordingly, this Court must assess whether the Department's findings in this case were "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law." *See* 5 U.S.C. § 706(2)(A); *Thomas Jefferson Univ.*, 512 U.S. at 512.

Under 42 C.F.R. § 412.106(a)(1)(i), the number of beds for purposes of the DSH adjustment is to be calculated in accordance with § 412.105(b), which also governs additional payments to hospitals for the indirect costs of medical education programs ("IME"). Section 412.105(b) states:

Determination of number of beds. For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period, not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.