261 F.Supp.2d 378 (2003)
DISTRICT MEMORIAL HOSPITAL OF SOUTHWESTERN NORTH CAROLINA, INC., Plaintiff;
v.
Tommy THOMPSON, in his official capacity as Secretary of the United States Department of Health and Human Services, Defendant.
No. 2:01CV259-C.
United States District Court, W.D. North Carolina, Bryson City Division.
February 4, 2003.
*379 Maureen Demarest Murray, Susan M. Fredenburg, Smith Moore, LLP, Greensboro, NC, for plaintiff.
Donald H. Caldwell, Jr., U.S. Attorney's Office, Charlotte, NC, Laura E. Ellis, Alex M. Azar, II, Sheree R. Kanner, Henry R. Goldberg, U.S. Dept. of HHS, Office of Gen. Counsel, Baltimore, MD, for defendant.

MEMORANDUM OF DECISION
COGBURN, United States Magistrate Judge.
This matter is before the Court on the parties' cross-motions for summary judgment. Having considered the parties' motions, briefs in support of their motions, and pleadings and having heard oral argument, the Court concludes that Plaintiffs Motion for Summary Judgment is due to be granted, and Defendant's Motion for Summary Judgment is due to be denied.

I. PROCEDURAL AND FACTUAL BACKGROUND
The facts are not in dispute in this case. Plaintiff District Memorial Hospital of Southwestern North Carolina, Inc. is a rural acute care hospital located in Andrews, North Carolina. Between September 30, 1991 and September 30, 1997, Plaintiff was licensed by the State of North Carolina for sixty to sixty-one acute care beds but staffed and operated forty-nine beds or less. At all times relevant to this dispute, Plaintiffs services were certified under Title XVIII of the Social Security *380 Act, 42 U.S.C. § 1395 et seq. ("Medicare").
In 1983, the United States Congress overhauled the Medicare payment system, which until that time had reimbursed hospitals for the "reasonable cost" of inpatient services rendered to beneficiaries covered by Medicare. See Cabell Huntington Hosp., Inc. v. Shalala, 101 F.3d 984, 985 (4th Cir.1996); Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261, 1262 (9th Cir.1996). This procedure was replaced in 1983, when Congress required the United States Department of Health and Human Services ("the Department") to implement the prospective payment system ("PPS"), under which hospitals are paid a fixed predetermined rate for each hospital discharge based on the patient's diagnosis related group. See 42 U.S.C. §§ 1395ww(d)(2), (d)(3); see also Jewish Hosp., Inc. v. Secretary of Health & Human Serv., 19 F.3d 270, 272 (6th Cir.1994) (explaining PPS as establishing a prospectively determined amount per discharge based on costs an efficiently operating hospital should incur to provide quality services based on patient's diagnosis at time of discharge). This system was initially implemented only for inpatient acute care services; long-term care hospitals, hospitals for children, and rehabilitation or psychiatric units of hospitals were omitted from the system. See 42 U.S.C. § 1395ww(d)(1)(B). Instead, those services continued to be reimbursed on a "reasonable cost" basis.
In establishing this system, however, Congress recognized that low-income Medicare patients generally have poorer health and are costlier to treat than higher-income Medicare patients. H.R.Rep. No. 98-25(1), at 141-42 (1983), reprinted in 1983 U.S.C.C.A.N. 219, 360-61; see also Cabell Huntington, 101 F.3d at 985. Congress, therefore, authorized the Secretary of the Department ("the Secretary") to disburse additional Medicare funds to hospitals that treat a disproportionate share of low-income patients, but the Secretary initially chose not to formulate the adjustment, known as the disproportionate share ("DSH") adjustment. See id. at 986. Congress then instructed the Secretary to formulate the adjustment by December 31, 1984, but the Secretary did not publish criteria for the DSH payments until 1986, after several hospitals sought a court order forcing compliance with the congressional mandate. See id.; see also Jewish Hosp., 19 F.3d at 275 (finding hospital's contention that the Secretary was hostile to concept of DSH adjustment "credible and compelling"). Congress then replaced the criteria published by the Secretary with its own criteria set forth in 42 U.S.C. §§ 1395ww(d)(5)(F). As discussed more fully below, it is the Secretary's interpretation of a regulation implementing and construing the term, "patient days," as used in these criteria that is at issue in this case. See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).
In 1987, the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration, which administers the Medicare program, approved Plaintiff as a swing-bed hospital. A "swing-bed" hospital is one which may, when necessary, use acute care beds to provide post-hospital skilled nursing facility ("SNF") care on a temporary basis.[1] See 42 U.S.C. § 1395tt(a)(1) (permitting hospitals to enter into agreement with Secretary under which inpatient hospital facilities may be used for furnishing services of the type which, if furnished by an SNF, would constitute extended care services); see also *381 Clark Reg'l Med. Ctr. v. United States Dep't of Health & Human Servs., 314 F.3d 241, 242 (6th Cir.2002). Thus, a swing-bed hospital may permit acute beds to "swing" temporarily to SNF care and then "swing back" to acute care when the SNF care is complete or the acute care bed is needed. See 42 U.S.C. § 1395tt(d); Clark, 314 F.3d at 242 n. 1. During the time period relevant to this action, however, SNF care provided by a swing-bed hospital was still reimbursed on a "reasonable cost" basis, not under the PPS system used to reimburse acute care services.[2]See id.
In its cost reports for fiscal years 1991 through 1997, Plaintiff included its swing bed utilization as "patient days" for purposes of calculating its DSH patient percentage. The Secretary's intermediary, vested with the responsibility of reimbursing Medicare providers, excluded days of service rendered to patients occupying swing beds when computing Plaintiffs disproportionate patient percentage. As a result of this exclusion, Plaintiff failed to qualify for the DSH adjustment and was denied additional reimbursement. Plaintiff asserts that it was denied $615,697 to which it was entitled under Medicare.
Plaintiff appealed the Notice of Program Reimbursement issued by the intermediary for the years in dispute to the Provider Reimbursement Review Board ("PRRB") pursuant to 42 U.S.C. § 1395oo. The PRRB reversed the intermediary's decision and held that Plaintiff was entitled to the DSH adjustment for all cost years under appeal.
The Administrator of CMS ("Administrator") reviewed the PRRB's decision and reversed, finding that swing-bed utilization should not be included in calculating a hospital's patient days for purposes of the DSH adjustment. The Administrator's decision then became the decision of the Secretary.
On October 29, 2001, Plaintiff filed this action under 42 U.S.C. § 1395oo(f)(1), seeking judicial review of the Secretary's decision. Plaintiff filed its Motion for Summary Judgment and accompanying brief on November 1, 2002, and the Secretary filed his Motion for Summary Judgment and brief in support on November 27, 2002. Plaintiff filed a Response to the Secretary's Motion for Summary Judgment on January 2, 2003. Both parties agree that the factual issues are not in dispute and that this matter is ripe for resolution on summary judgment.

II. STANDARD OF REVIEW
In reviewing an agency's interpretation of a statute it administers, a court must first determine "whether Congress has directly spoken to the precise question at issue." Cheirron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If congressional intent is clear, the court and the agency must give effect to that intent. Id., 467 U.S. at 842-43, 104 S.Ct. at 2781. If, *382 however, Congress is silent or ambiguous on the question at issue, the court must determine whether the agency's interpretation of the statute is based on a permissible construction of the statute. Id., 467 U.S. at 843, 104 S.Ct. at 2782. As explained by the Court in Chevron, "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id., 467 U.S. at 844, 104 S.Ct. at 2782. The court must reject, however, "administrative constructions of [a] statute... that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys., 468 U.S. 137, 143, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984).
If an agency enacts regulations to implement congressional intent as expressed in a statute it administers and the court determines that the regulation reflects a permissible construction of the statute, the next issue is whether the agency's interpretation of its own regulation is valid. In making this determination, we accord an agency's interpretation of its regulation "substantial deference." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994); see also Clark, 314 F.3d at 245 ("Our review of an agency's interpretation of its own regulations is highly deferential"). That is, we must defer to an agency's interpretation of its regulation unless an "alternate reading is compelled by the regulation's plain language." Thomas Jefferson Univ., 512 U.S. at 512, 114 S.Ct. at 2386.

III. DISCUSSION

A. DSH Adjustment
The issue in this case, then, is whether the Secretary appropriately determined that the days during which Plaintiffs swing beds were utilized during the years at issue should be excluded from the "patient days" calculation for purposes of DSH adjustment eligibility. As set forth above, after the Department promulgated regulations establishing parameters for the DSH adjustment, Congress amended the Medicare statute to specify the DSH adjustment eligibility criteria. See 42 U.S.C. § 1395ww(d)(5)(F). Under these criteria, a hospital is entitled to a DSH adjustment if its "disproportionate patient percentage" equals a specified percentage, depending on the size of the hospital. Id. § 1395ww(d)(5)(F)(v). Thus, if a hospital is located in an urban area and has 100 or more beds, its disproportionate patient percentage must equal or exceed fifteen-percent (15%) for discharges prior to April 2001 to be entitled to a DSH adjustment, while a hospital located in a rural area that has less than 100 beds must have a disproportionate patient percentage of forty-five-percent (45%) for discharges prior to April 2001.[3]Id. Congress then defined "disproportionate patient percentage" to be the sum of two fractions. As explained by the Fourth Circuit, "[b]oth fractions are designed to count the number of low-income patients served by a hospital, but each fraction counts a different group of those patients." Cabell Huntington, 101 F.3d at 986. The first fraction, called the "Medicare proxy" counts Medicare recipients who are entitled to supplemental security income, a federal low-income supplement. Id; see also 42 U.S.C. *383 § 1395ww(d)(5)(F)(vi)(I). The second fraction is called the "Medicaid proxy," and counts patients who are not entitled to Medicare benefits but who qualify for Medicaid. Cabell Huntington, 101 F.3d at 986; see also 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Specifically, the Medicaid proxy, codified at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), is defined as:
the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [the Medicaid program], but who were not entitled to benefits under part A of [the Medicare program], and the denominator of which is the total number of the hospital's patient days for such period.
42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The number of a hospital's "patient days" and the percentage of those patient days representing Medicaid-eligible patients, then, is central to a hospital's eligibility for a DSH adjustment.
In this case, the issue, as stated above, is whether the Secretary properly concluded that swing bed utilization days do not count as "patient days" for purposes of the Medicaid proxy. While we know that the purpose of the DSH adjustment is to ensure that hospitals who treat a disproportionate percentage of low-income patients receive a higher level of reimbursement under PPS than those hospitals that do not serve a disproportionate percentage of low-income patients, nothing in the language of the Medicaid proxy defines "patient days" to either include or exclude swing bed utilization days. The Department, however, has promulgated a regulation in which it limits "patient days" to "those days attributable to areas of the hospital that are subject to the prospective payment system and excludes all others." 42 C.F.R. § 412.106(a)(I)(ii).
In arguing that the Secretary improperly excluded the patient days attributable to swing beds in this case, Plaintiff argues that this regulation is plain on its face and permits the exclusion of patient days only if those days are attributable to geographic areas of the hospitalto beds in a particular part of the hospitalthat are excluded from PPS. The Secretary argues, however, that this regulation is ambiguous and that the Court must, therefore, defer to his interpretation as long as it is not plainly erroneous or inconsistent with the regulation. Specifically, the Secretary argues that the word, "areas," in this context means "to cover the scope of those patient days involving inpatient hospital services that could be covered under PPS. According to the Secretary, since SNF care is not care that was covered under PPS during the years at issue, beds utilized for SNF care do not count toward "patient days," regardless of where in the hospital they were located.
Although the Court is cognizant of the "substantial deference" accorded an agency's interpretation of its own rules, see Thomas Jefferson Univ., 512 U.S. at 512, 114 S.Ct. at 2386, the Court agrees with Plaintiff in this case that the regulation is clear and that, in this context, the word "areas" admits of only one meaningto wit, a geographic area of the hospital. See Alhambra Hosp. v. Thompson, 259 F.3d 1071, 1074 (9th Cir.2001) (rejecting the Secretary's interpretation of § 412.106(a) and holding that "areas of the hospital" is not ambiguous and refers to geographic areas of the hospital); see also Clark, 314 F.3d at 249 (rejecting the Department's interpretation of another DSH regulatory provision as applied to swing beds on the basis that the Department's interpretation was contrary to the regulation's plain language) *384 In reaching this conclusion, the Court notes, first, that the word "area" is directly followed by, and modified by, the phrase, "of the hospital." "Hospital" is ordinarily defined as "an institution where the sick or injured are given medical or surgical care." Mirriam Webster's Collegiate Dictionary (10th ed.1994). As ordinarily defined, then, a "hospital" is a physical place where medical care is provided. While the Secretary correctly notes that "area" can be defined as "the scope of a concept, operation, or activity," this definition does not make sense when considered in conjunction with "hospital," defined as a physical place. Instead, when modified by "of the hospital," the plain and ordinary meaning of "area" is "a geographic region" of the hospital. See id.
The Secretary, however, also notes that "hospital," as used in subsection (d) of § 1395ww is a defined term, meaning any hospital that is not a psychiatric hospital, a rehabilitation hospital, a children's hospital, a long-term care facility, or a hospital involved extensively in treatment for, or research on, cancer. 42 U.S.C. § 1395ww(d)(1)(B). This subsection also excludes from the definition of a "subsection (d)" hospital "a psychiatric or rehabilitation unit of the hospital which is a distinct part of the hospital ...." Id. In this case, it is undisputed that Plaintiff qualifies as a subsection (d) hospital. Additionally, by definition, swing beds do not comprise a "psychiatric or rehabilitation unit," constituting a "distinct part of the hospital," and, therefore, are located within a subsection (d) hospital. Even construing "hospital" as defined in § 1395ww(d)(1)(B), then, nothing in its definition suggests an understanding of hospital other than a physical place where medical care is rendered and received. "Hospital" is defined to exclude certain types of hospitals, but under the definition in § 1395ww(d)(1)(B), it remains a physical location defined by geographic boundaries.
The Secretary argues, however, that "areas" in this context is a conceptual indicator, meaning "to 'cover the scope of those patient days involving inpatient hospital services that could be covered under PPS." (Def. Br. Supp. Summ. J. at 11). This interpretation requires that providers go well beyond the plain language of the regulation to conclude that the Secretary did not mean "hospital" as a physical place, but was referring instead to a group of services offered anywhere within the hospital complex or building but nowhere in particular. Even understanding how the Secretary could interpret "area of the hospital" to mean "to 'cover the scope of those patient days involving inpatient hospital services that could be covered under PPS" is a challenge. That even comprehending the Secretary's interpretation of the phrase is difficult when the language usedareas of the hospitalis so plain establishes that the Secretary's interpretation does not follow from the plain and ordinary meaning of the language used. Thus, while it is theoretically possible that the Secretary may have intended "areas of the hospital" to refer to an a-geographic set of services, this interpretation does not follow from the plain and ordinary meaning of the words used in his regulation. In short, "[t]he language of the [regulation] is too strong to bend" as the Secretary would wish. See Chickasaw Nation v. United States, 534 U.S. 84, 88, 122 S.Ct. 528, 532, 151 L.Ed.2d 474 (2001).
The Secretary also draws support for his interpretation from the preamble to the final rule, as set forth in the Federal Register, in which the Department discusses 42 C.F.R. § 412.106 and, in particular, its definition of hospital "patient days." See 53 Fed.Reg. 38476, 38480 (Sept. 30, 1988). In response to concerns that the definition *385 for "patient days" will apply retroactively, as well as prospectively, the Department stated, in pertinent part:
Although previously the Medicare regulations did not specifically define the inpatient days for use in the computation of a hospital's disproportionate share patient percentage, we believe that, based on a reading of the language in [§ 1395ww(d)(5)(F)] of the Act, ... we are in fact required to consider only those inpatient days to which the prospective payment system applies in determining a prospective payment hospital's eligibility for a disproportionate share adjustment. Congress clearly intended that a disproportionate share hospital be defined in terms of a subsection (d) hospital, which is the only type of hospital subject to the prospective payment system.
. . . . .
[T]his reading of [§ 1395ww(d)(5)(F) ] of the Act produces the most consistent application of the disproportionate share adjustment, since only data from prospective payment hospitals or from hospital units subject to the prospective payment system are used in determining both the qualification for and the amount of additional payments to hospitals that are eligible for a disproportionate share adjustment.
Id. According to the Secretary, this preamble makes clear that the Department intended only to include inpatient days to which PPS applies in calculating a hospital's eligibility for a DSH adjustment.
The Secretary's reliance on this preamble to the final rule, however, is misplaced. First, as set forth above, where the language of a regulation is plain, the matter of interpretation ends and the language must be given effect. Thus, regardless of the Department's own interpretation of the rule, if that interpretation is contrary to the plain and ordinary meaning of the words used in the regulation, as it is here, that interpretation cannot stand.
Second, the language cited above does not answer the question before this Court. While the language makes clear that the Department believes that "hospital" as used in § 1395ww(d)(5)(F) means "subsection (d) hospital" and extrapolates therefrom that only those inpatient days to which PPS applies should be considered in determining a hospital's eligibility for a DSH adjustment, the preamble also states that data from "hospitals" or from "hospital units" subject to PPS are used in determining DSH adjustment eligibility. The use of the words, "hospitals" and "hospital units" again connotes a physical building or area, not a group of similar services. This construction seems particularly appropriate in light of the statute's definition of subsection (d) hospitals to include all hospitals except certain kinds of hospitals and hospital units that are "a distinct part" of the hospital. Thus, even though the language early in this section uses the more precise "inpatient days to which the [PPS] applies," the language used later in the section stating that "data from [subsection (d) ] hospitals or from hospital units subject to the [PPS]" suggests a geographic measure. Even if the Court were permitted, therefore, to consider the Department's explanation of the rule, as set forth in the preamble to the final rule at the time of its promulgation, the Department's explanation does not appear directly to answer the question.
Third, with respect to the Department's preamble to the final rule, the Court notes that in its preamble to its proposed rule, prior to promulgation of the final rule, the Department explained its definition of "patient days" to be codified at 42 C.F.R. § 412.106(a) in terms of "units" and "distinct parts" of the hospital, again suggesting *386 a geographic understanding of hospital areas. See 53 Fed.Reg. 9337, 9339 (March 22, 1988). While the Department stated, as it did in the preamble to the final rule, that it believed Congress intended "hospital" as used in § 1395ww(d)(5)(F) to refer specifically to "subsection (d) hospital," it also used the language "areas of the hospital" and stated that "[p]atient days attributable to excluded distinct part units of the hospital, such as psychiatric and rehabilitation units, are not counted." Id. (emphasis added). The Department concluded in its preamble, that it was "proposing to revise [42 C.F.R.] § 412.106(a) to state that only those days attributable to parts of the hospital paid under the [PPS]that is, the subsection (d) hospital as defined in [§ 1395ww(d)(5)(F) ] of the Actwould be counted in determining a hospital's eligibility for a[DSH] adjustment." Id. at 9340. Thus, while there is language in the preamble to the final rule that could be construed to suggest the Department intended the interpretation of the regulation the Secretary urges this Court to accept, the rest of the language used when discussing the final rule and all of the language used in introducing the proposed rule suggests that the Department considered "areas of the hospital" as used in the regulation to refer to distinct physical areas of the hospital.
Finally, the Secretary argues that an interpretation of the rule that permits the inclusion of swing bed utilization days in the DSH calculation undermines the purpose of the DSH adjustment as articulated by Congress. Specifically, the Secretary argues that because Congress intended the DSH adjustment to lessen the financial impact of PPS on subsection (d) hospitals who served a disproportionate share of low-income patients, it would not make sense to permit in the eligibility calculation patient days from patients receiving SNF care, which care was reimbursed under the "reasonable cost" method of reimbursement and not affected by PPS at all. The Court agrees that the Secretary's rationale makes good sense. We are faced, however, with the task of construing the regulation the Secretary has promulgated, not with an imaginary regulation that would have better accorded with Congressional intent. As discussed above, the Court's task is not to rewrite regulations that could have been better drafted or to second-guess agency action that reflects a reasonable interpretation of Congressional intent as expressed in the statute at issue. In this case, Congress did not define "patient days" as used in § 1395ww(d)(5)(F), and it is clear from this dispute that "patient days" is susceptible to different interpretations. In response to this ambiguity, the Department promulgated 42 C.F.R. § 412.106. While the Secretary could have chosen any number of definitions, including a definition that made clear that "patient days" as used in the statute referred only to those patient days during which the services rendered were subject to reimbursement under PPS, instead, the Secretary limited "patient days" to "days attributable to areas of the hospital that are subject to the [PPS]." 42 C.F.R. § 412.106. While this definition of "patient days" may not be the best definition in terms of the purpose of § 1395ww(d)(5)(F), neither party argues that this definition is an unreasonable construction of the statute, and the Court agrees that under Chevron review, the regulation is reasonable. See Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."). As such, the Court has no choice but to give effect to the plain meaning of *387 the regulation if that meaning is clear. While the Secretary argues that the regulation is ambiguous and susceptible to more than one interpretation, the plain and ordinary meaning of the words used is clear. Creative and zealous lawyers can question the plain and ordinary meaning of almost any word. In the context in which it is used in this regulation, however, the plain and ordinary meaning of the phrase, "areas of the hospital," is geographic areas of the hospital.
In conclusion, the Court notes that just as an agency is not authorized to distort the plain meaning of its enabling legislation, so an agency lacks the authority to interpret its own regulation in a manner contrary to the regulation's plain and ordinary meaning. To hold otherwise would permit an administrative agency to promulgate a regulation through the procedures of the Administrative Procedure Actthat is, requiring publication of the proposed rule, receipt of public comment, and publication of the final ruleand then interpret the regulation to mean something other than the plain meaning of the language used in the regulation. See 5 U.S.C. § 553; Brown v. Rock Creek Mining Co., 996 F.2d 812, 818 (6th Cir.1993) (Batchelder, J. dissenting) (quoted with approval in Jewish Hosp., 19 F.3d at 274) ("Where the language of the regulation is clear and plain, not only is there no reason to let the [agency director] offer an interpretation of it, ... but there is every reason not to do so."). This distortion of the administrative process would undermine its very purposeto give members of the public and interested citizens the opportunity to comment and potentially influence administrative agency rulemaking and to put the public on notice as to regulatory policy choices and regulatory changes. See Chocolate Mfrs. Ass'n v. Block, 755 F.2d 1098, 1103-04 (4th Cir. 1985). Because the plain meaning regulation at issue in this case is clear, the Court can go no further, but rather, must give effect to the language as promulgated.

B. Interest
In addition to moving for summary judgment, Plaintiff also requests in its motion that if the Court holds that the Secretary failed to reimburse Plaintiff amounts due under the DSH adjustment for fiscal years 1991-1997, the Court also award it interest pursuant to 42 U.S.C. § 1395oo(f)(2). The Court agrees with Plaintiff that it is entitled to interest under § 1395oo(f)(2), but because this review is of an administrative proceeding, the Court will remand the matter to the Secretary for the prompt payment to Plaintiff of the amount in controversy, plus interest in accordance with § 1395oo(f)(2). See Deaconess Health Serv. Corp. v. Shalala, 912 F.Supp. 438, 448 (E.D.Mo.1995), affd, 83 F.3d 1041 (8th Cir.1996).

C. Attorney's Fees
Finally, Plaintiff moves this Court for attorney's fees pursuant to 42 U.S.C. §§ 2412(b), (d)(1)(A). Section 2412 provides for an award of attorney's fees to a "prevailing party," under certain circumstances, in civil actions brought by or against the United States. See id. The assessment of whether attorney's fees are due to be awarded and, if so, what the award should be requires an analysis distinct from the issues discussed herein and should appropriately be considered upon a petition for attorney's fees filed by a prevailing party after judgment for that party is entered. Accordingly, the Court will defer ruling on Plaintiffs request for attorney's fee until judgment has been entered in favor of Plaintiff, Plaintiff files a petition seeking such fees, and the Secretary is given the opportunity to respond to Plaintiffs petition.

*388 IV. CONCLUSION
For the reasons set forth herein, the Court agrees with Plaintiff that the Secretary improperly excluded from the DSH eligibility calculation the patient days utilized by Plaintiffs swing bed patients for fiscal years 1991 through 1997. Accordingly, Plaintiffs motion for summary judgment is due to be granted; Defendant's motion for summary judgment is due to be denied.
NOTES
[1] In order to obtain approval from CMS to operate swing beds, a hospital must, interalia, have fewer than 100 beds and be located in a rural area. 42 C.F.R. § 482.66(a).
[2] Beginning with services furnished in cost reporting periods beginning after July 1, 2002, "[p]osthospital SNF care furnished in general routine inpatient beds in rural hospitals... is paid in accordance with the provisions of the [PPS] for SNFs." 42 C.F.R. § 413.114. In order to obtain reimbursement for swing-bed utilization under the "reasonable cost" methodology for services furnished in cost reporting periods beginning before July 1, 2002, a hospital with more than forty-nine but less than 100 beds had to transfer a posthospital SNF care patient within five days of an SNF bed in the geographic region becoming available. Id. § 413.114(d)(1). A larger swing-bed facility could not, therefore, try to increase its reimbursements or DSH patient percentages by keeping SNF care patients after a bed outside of the facility became available.
[3] For discharges occurring on or after April 1, 2001, the disproportionate patient percentage must only equal or exceed fifteen-percent (15%) for the hospital to be considered to serve a significantly disproportionate number of low-income patients. See 42 U.S.C. § 1395ww(d)(5)(F)(v).