

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-3-2005

# Altoona Hospital v. Secretary HHS

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-2589

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Altoona Hospital v. Secretary HHS" (2005). *2005 Decisions*. Paper 1255.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1255

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-2589

ALTOONA HOSPITAL, a Pennsylvania
nonprofit corporation,

Appellant

v.

TOMMY THOMPSON, SECRETARY OF HEALTH
AND HUMAN SERVICES

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 02-cv-00147J
District Judge:  The Honorable Kim R. Gibson

Submitted Under Third Circuit LAR 34.1(a)
April 6, 2005

Before: BARRY, AMBRO, and GREENBERG, Circuit Judges

(Opinion Filed:  May 3, 2005)

OPINION

BARRY, Circuit Judge

Under the Medicare program, teaching hospitals are entitled to reimbursement for

the indirect cost of operating a medical residency program. This "indirect medical education" ("IME") adjustment is determined by a statutory formula, which is partially based on the ratio of full-time residents to the number of available beds at a specific facility during the relevant cost reporting period.[1] Although the Social Security Act ("SSA") itself does not define "available beds," the term has been given interpretive gloss by the Department of Health and Human Services ("HHS"), the agency charged with administering the Medicare program.

This case requires us to determine whether HHS' calculation of the number of available beds at Altoona Hospital ("Hospital") for the 1996 reporting period is entitled to deference. We conclude that HHS' interpretation of the statutory term was not arbitrary and capricious and that the agency properly applied its own definition. Accordingly, we will affirm.

**I.**

The dispute in this case involves the amount of IME reimbursement to which the Hospital was entitled for the period ending June 30, 1996. Following an on-site visit, the Medicare fiscal intermediary reported that there were 278 available beds at the Hospital, based on a counting of beds that were physically ready to be occupied by patients (rooms cleaned, oxygen hookups operational, call buttons functioning, etc.).

The Hospital does not dispute that it maintained 278 beds which were ready to be

---

[1] For present purposes, it is sufficient to observe that as the number of "available beds" increases, the amount of the IME to which a particular facility is entitled decreases.

occupied. Moreover, the Hospital concedes that none of these 278 beds was designated for non-use and that any of the beds could have been used to lodge a patient on a particular day. The Hospital timely challenged the intermediary's calculation of its IME reimbursement before the appropriate agency body, the Provider Reimbursement Review Board ("PRRB").

The Hospital's position is that because it had insufficient personnel to simultaneously staff more than 210 beds, it necessarily had only 210 available beds for purposes of calculating the IME reimbursement. The record indicates that the Hospital's average census for the relevant period was 162 beds, with a peak occupancy of 201 beds. In testimony before the PRRB, a witness for the Hospital indicated that the 210 figure proposed by the Hospital represented the maximum number of patients that the Hospital could accommodate, simultaneously, using all of its existing staffing resources.[2] In order to accommodate more than 210 patients, the witness indicated, the Hospital would have been required to hire additional nurses.

When asked, on cross-examination, why the Hospital maintained 278 beds, the witness stated that "the hospital is always wanting to be sure that we have capacity and because they're available and there." App. 123. In addition, the witness admitted that

---

[2] In order to achieve this maximum capacity, the witness testified, the Hospital's full-time nurses would need to work overtime, its part-time nurses would need to work additional days, and all of its "casual" (i.e., limited availability) nurses would need to be called in to work. App. at 110.

3

there was a potential for an increase in patient census, such that the additional beds would become necessary, and that the Hospital hoped to gain market share. On re-direct, however, the witness made clear that a spike in patient census could not be accommodated immediately, because it would take more than 24-48 hours to properly staff the remaining 68 beds.

The PRRB upheld the intermediary's findings, including its determination that the Hospital had 278 available beds. When the Administrator of the Centers for Medicare and Medicaid Services declined review, the PRRB's decision became final. See 42 U.S.C. § 1395oo(f)(1). The Hospital then initiated an action in the District Court seeking judicial review of the agency's decision. On March 30, 2004, the District Court granted appellee's motion for summary judgment and denied the Hospital's motion for summary judgment. This appeal followed.

## II.

Pursuant to 42 U.S.C. § 1395oo(f)(1), judicial review of a decision of the PRRB is subject to review under the Administrative Procedure Act ("APA"). Under the APA, a reviewing court may not "hold unlawful and set aside" agency findings or conclusions unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E), or are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A); see Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).

It is well settled that an agency's interpretation of its own regulations must be

4

afforded substantial deference. Thomas Jefferson, 512 U.S. at 512. "Our task is not to decide which among several competing interpretations best serves the regulatory purpose." Id. Instead, "the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Id. (internal quotation omitted).

### III.

The SSA establishes a formula, labeled the "indirect teaching adjustment factor," which is used in the calculation of a hospital's IME reimbursement. See 42 U.S.C. § 1395ww(d)(5)(B)(ii). This formula incorporates a statutorily defined value ('r'), which is equal to the "ratio of the number of interns and residents . . . with respect to the hospital for its most recent cost reporting period to the hospital's available beds (as defined by the Secretary) during that cost reporting period." Id. § 1395ww(d)(5)(B)(vi). As noted, the statute does not define the term "available beds."

The implementing regulation states, in pertinent part, that "the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period . . . and dividing that number by the number of days in the cost reporting period." 42 C.F.R. § 412.105(b) (1995).[3] Once again, the term "available beds" was not

---

[3] Although this regulation was subsequently amended, see 42 C.F.R. § 412.105(b) (2004), we are bound to consider the administrative scheme as it existed at the time the dispute arose, see Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language

5

defined, although the regulation did indicate that "beds or bassinets in the healthy newborn nursery, custodial care beds, [and] beds in distinct hospital part units" were not to be included in the calculation of available bed days. Id.

Both parties cite as supportive of their respective positions a particular section in the agency's "Medicare Provider Reimbursement Manual" ("PRM"), which was designed to clarify the regulation at issue. That provision states:

> To be considered an available bed, a bed must be permanently maintained for lodging inpatients. It must be available for use and housed in patient rooms or wards (i.e.[,] not corridors or temporary beds). Thus, beds in a completely or partially closed wing of the facility are considered available only if the hospital put the beds into use when they are needed. The term "available beds" as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being use [sic]. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service.
>
> In the absence of evidence to the contrary, beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting period. The hospital bears the burden of proof to exclude beds from the count.

PRM § 2405.4(G) (App. 329).

The parties have also cited an Administrative Bulletin ("the Bulletin") published by the Blue Cross and Blue Shield Association ("BCBS").[4] The Bulletin indicates that

requires this result.").

[4] At first glance, it may seem curious to treat as relevant the views of a third-party commercial entity. It appears, however, that the Administrative Bulletin was merely reproducing the agency's own policy, as originally expressed in correspondence with BCBS, one of its fiscal intermediaries. See Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48916, 49092 n.6 (Aug. 11,

"[i]n a situation where rooms or floors are temporarily unoccupied, the beds in these areas must be counted, provided . . . the beds can be adequately covered by either employed nurses or nurses from a nurse registry." Administrative Bulletin No. 1841, 88.01 (November 18, 1988) (App. 379). In this situation, the Bulletin explains, "the beds are considered 'available' and must be counted even though it may take 24-48 hours to get nurses on duty from the registry." Id.

Upon review of the regulatory framework, we conclude that nothing in the various attempts to define "available beds" suggests that the 68 beds in dispute here should be excluded from the calculation of the Hospital's IME reimbursement. The Hospital suggests that PRM § 2405.3(G) creates the following two-part test for determining when a bed should be counted: (1) the bed is "permanently maintained for lodging inpatients" and (2) the hospital "put[s] the beds into use when they are needed." Appellant's Br. at 16. Because there are insufficient nurses at Altoona Hospital to simultaneously service more than 210 patients, the Hospital contends, the 68 beds at issue cannot be put to use "when they are needed" and should therefore be excluded from the count.

The flaw in the Hospital's position is that the two-part test it derives from the PRM ignores material language in § 2405.3(G). A full reading of the relevant PRM sentence reveals that a hospital's ability to put beds into use when needed is only relevant in

---

2004) (referring to the BCBS Administrative Bulletin as setting forth the agency's policy).

7

circumstances where the beds in question are located "in a completely or partially closed wing of the facility." PRM § 2405.3(G). The record in this case reveals that the Hospital never closed specific wings or floors within the facility. None of the 278 beds was designated for non-use or taken out of service. To the contrary, the record demonstrates that the Hospital used most (if not all) of the 278 beds from time-to-time to house inpatients. In these circumstances, the PRM explains, any bed that is "permanently maintained for lodging inpatients" must be counted.[5]

Having determined that HHS properly applied its own definition of the term "available beds," the question becomes whether that definition, as published in the PRM, constitutes an arbitrary and capricious interpretation of the statute and/or the relevant regulation. We conclude that it does not. Congress established the IME reimbursement to compensate teaching hospitals for the increased operational costs associated with the training of residents and interns. The statutory formula for IME payments uses the ratio of residents to available beds to measure the teaching intensity at a particular hospital. In Little Company of Mary Hospital & Health Care Centers v. Shalala, 165 F.3d 1162 (7th Cir. 1999), Judge Posner offered a (relatively) succinct explanation of Congress'

---

[5] For similar reasons, the Hospital's reliance on the Bulletin's discussion of a 24-48 hour window for securing nursing services is misplaced. Once again, the language of the Bulletin makes clear that this timing requirement is applicable only in circumstances where the beds in question are located in "rooms or floors [which] are temporarily unoccupied." Because the Hospital has not alleged that any of its rooms or floors were closed off, even temporarily, the Hospital's oft-repeated claim that it could not have staffed the additional 68 beds within 48 hours is irrelevant.

methodology:

> [I]f the hospital has fewer beds, it probably has a smaller medical staff, and hence a higher ratio of interns and residents to fully trained doctors–the teachers. The higher that ratio, the more training the fully trained doctors must do. Suppose Hospital A has 300 beds, 75 interns and residents, and 25 fully trained doctors, and Hospital B has 600 beds, 75 interns and residents, and 125 fully trained doctors (so that in both hospitals there is one doctor for every three beds). The fully trained doctors in Hospital A will have much heavier teaching loads than the fully trained doctors in B because the ratio of interns and residents to fully trained doctors is so much higher in A (3:1) than in B (3:5).

Id. at 1164.

This discussion crystalizes why Congress did what it did. Congress contemplated that the agency would count beds as a proxy not for the number of patients, as the Hospital suggests, but rather for the number of doctors at a given facility. This is significant because it demonstrates that Congress elected not to have the agency count doctors, which at least in theory could have been done, in the course of calculating a facility's IME reimbursement. Presumably, Congress chose to tie the amount of reimbursement to the number of beds in a facility because a simple counting of the beds maintained for patient use would be less burdensome for the agency and, in all likelihood, less susceptible to manipulation by the hospitals.

Given this understanding, it seems reasonable to do as the agency has done and decline to engraft staffing concerns onto the definition of "available beds." Were the availability of sufficient nursing personnel relevant to the calculus, the agency would be required to do precisely what Congress did not want it not do in the first place – count

9

hospital employees. Under these circumstances, deference to HHS' definition is appropriate.[6]

## IV.

For the reasons stated, the March 30, 2004 order of the District Court will be affirmed.

---

[6] We observe, as a final matter, that there was substantial evidence in the record to support the PRRB's factual finding as to the number of available beds. The Hospital has not disputed that it maintained 278 beds for immediate use by inpatients. Accordingly, we are bound by the PRRB's conclusion that the Hospital had 278 available beds.