FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COUNTY OF LOS ANGELES,
            *Plaintiff-Appellant,*

            v.

MICHAEL O. LEAVITT, Secretary of
the United States Department of
Health and Human Services,
            *Defendant-Appellee.*

No. 06-55222

D.C. No.
CV-04-04236-TJH

OPINION

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Chief District Judge, Presiding

Argued and Submitted
November 6, 2007—Pasadena, California

Filed March 31, 2008

Before: Betty B. Fletcher, Stephen Reinhardt, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Rymer;
Dissent by Judge Reinhardt

**COUNSEL**

Tami S. Smason, Foley & Lardner LLP, Los Angeles, California, for the plaintiff-appellant.

John S. Koppel, United States Department of Justice, Civil Division, Washington, D.C., for the defendant-appellee.

**OPINION**

RYMER, Circuit Judge:

This appeal, which involves Medicare reimbursement of indirect medical education expenses (IME) incurred by a public teaching hospital with an approved intern and resident program, presents two questions: first, whether it was arbitrary and capricious for the Secretary of Health and Human Services to interpret the Medicare statute and regulations providing for IME payment on the basis of "available beds" as presumptively meaning physical beds, when the hospital's fiscal intermediary had previously accepted a calculation based on budgeted beds; and second, whether the Secretary's findings in this case were supported by substantial evidence.

Los Angeles County/University of Southern California Medical Center (County/USC or Med Center) appeals the district court's judgment upholding a final determination by the Provider Reimbursement Review Board (PRRB) that County/USC's intermediary, Blue Cross and Blue Shield Association (Blue Cross), properly used a physical bed count in the formula for calculating the hospital's IME adjustment for fiscal year ending (FYE) June 30, 1994. We conclude that the Sec-

retary had discretion to presume that "available beds" means actual beds, rather than budgeted beds. We owe deference to this interpretation. Applying it, we conclude that the PRRB could find, based on the record, that County/USC failed to carry its burden of proving that beds in excess of the budgeted bed figure should be excluded from the physical count. Substantial evidence supports the PRRB's decision because the actual number of beds at County/USC that were physically ready to be occupied was not in dispute, and there was evidence that all beds at the hospital — whether budgeted or not — were maintained and could be used at any time for patient care. Accordingly, the Secretary's determination was not arbitrary and capricious.

I

All hospitals with a provider agreement receive predetermined payments for discharged patients under the "prospective payment system" (PPS).[1] As a teaching hospital subject to PPS, County/USC is entitled to an additional payment to cover the added, indirect costs of medical education. 42 U.S.C. § 1395ww(d)(5)(B) (2006). The amount of the IME adjustment is based on a hospital's ratio of full-time equivalent interns and residents to available beds.

The calculation is complicated, but the bottom line is that the higher the number of beds, the lower the eventual payment and vice versa. *See Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala*, 165 F.3d 1162, 1164 (7th Cir. 1999).[2]

---

[1]Congress established a "prospective payment system" for operating costs of inpatient hospital services for reporting periods beginning on or after October 1, 1983. 42 U.S.C. § 1395ww(d); 42 C.F.R. § 412.6 (2007). Under the PPS, a hospital is paid a predetermined amount for each discharged patient that is intended to cover the cost of all inpatient hospital services furnished to that patient.

[2]As Judge Posner explained:

The government has found that the higher the ratio of [the number of interns and residents] to the number of beds (and the fewer

The Social Security Act caps this ratio at the ratio of interns and residents to "available beds (as defined by the Secretary)" during the hospital's most recent cost reporting period. 42 U.S.C. § 1395ww(d)(5)(B)(vi).

The implementing regulation provides, in pertinent part:

> For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period, not including beds or bassinets in the healthy new-born nursery, custodial care beds, or beds in distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

42 C.F.R. 412.105(b) (1993).[3]

---

the number of beds, holding number of interns and residents constant, the higher that ratio will be), the more teaching the hospital will be doing. For if the hospital has fewer beds, it probably has a smaller medical staff, and hence a higher ratio of interns and residents to fully trained doctors—the teachers. The higher that ratio, the more training the fully trained doctors must do. Suppose Hospital A has 300 beds, 75 interns and residents, and 25 fully trained doctors, and Hospital B has 600 beds, 75 interns and residents, and 125 fully trained doctors (so that in both hospitals there is one doctor for every three beds). The fully trained doctors in Hospital A will have much heavier teaching loads than the fully trained doctors in B because the ratio of interns and residents to fully trained doctors is so much higher in A (3:1) than in B (3:5).

*Little Co. Of Mary Hosp.*, 165 F.3d at 1164.

[3]In the course of making changes to the IME regulation that are not at issue here, the Secretary stated in the preamble to the final rule for "Medicare Program: Changes to the Inpatient Hospital Prospective Payment System":

> For purposes of the prospective payment system, "available beds" are generally defined as adult or pediatric beds (exclusive of newborn bassinets, beds in excluded units, and custodial beds that are clearly identifiable) maintained for lodging inpatients.

The Provider Reimbursement Manual (PRM) issued by the Health Care Financing Administration (HCFA),[4] which administers the medicare program for the Secretary, defines "available beds" for purposes of the IME adjustment:

> A bed is defined for this purpose as an adult or pediatric bed (exclusive of beds assigned to newborns which are not in intensive care areas, custodial beds, and beds in excluded units) maintained for lodging inpatients, including beds in intensive care units, coronary care units, neonatal intensive care units, and other special care inpatient hospital units. Beds in the following locations are excluded from the definition: hospital-based skilled nursing facilities or in any inpatient area(s) of the facility not certified as an acute care hospital, labor rooms, PPS excluded units such as psychiatric or rehabilitation units, post anaesthesia or postoperative recovery rooms, outpatient areas, emergency rooms, ancillary departments, nurses' and other staff residences, and other such areas as are regularly maintained and utilized for only a portion of the stay of patients or for purposes other than inpatient lodging.
>
> To be considered an available bed, a bed must be permanently maintained for lodging inpatients. It must be available for use and housed in patient

Beds used for purposes other than inpatient lodgings, beds certified as long-term, and temporary beds are not counted. If some of the hospital's wings or rooms on a floor are temporarily unoccupied, the beds in these areas are counted if they can be immediately opened and occupied.

50 Fed.Reg. 35,646, 35,683 (September 3, 1985).

[4] HCFA is now known as the Centers for Medicare and Medicaid Services (CMS), but the parties and the PRRB continue to refer to the agency as HCFA, as shall we.

rooms or wards (i.e., not in corridors or temporary beds). Thus, beds in a completely or partially closed wing of the facility are considered available only if the hospital put [sic] the beds into use when they are needed. The term "available beds" as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service.

HCFA Pub. 15-1 § 2405.3G (Rev. 345); PRM, § 2405.3G (Adjustment for the Indirect Cost of Medical Education) (August 1988).[5]

Blue Cross also published an Administrative Bulletin which pertains to the IME adjustment. It indicates how to treat areas of a hospital that are temporarily or permanently closed:

In a situation where rooms or floors are temporarily unoccupied, the beds in these areas must be counted, provided the area in which the beds are contained is included in the hospital's depreciable plant assets, and the beds can be adequately covered by either employed nurses or nurses from a nurse registry. In this situation, the beds are considered "available" and must be counted even though it may take 24-48 hours to get nurses on duty from the registry.

*Administrative Bulletin* No.1841, 88.01 (November 18, 1988).

Against this backdrop, a provider of covered care such as

---

[5]The Supreme Court described another section of the PRM as a "prototypical example" of an interpretative rule " 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.' " *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995).

County/USC submits a cost report to its fiscal intermediary each year. An intermediary — in this case, Blue Cross — is a private entity with whom the Secretary contracts to determine the amount of Medicare payments to be made to a provider based on the cost report. The report shows the costs incurred during the fiscal year and what proportion is to be allocated to Medicare. A provider that is dissatisfied with the intermediary's determination may request a hearing before the PRRB. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

County/USC is one of six acute care hospitals owned and operated by Los Angeles County. It is a major teaching hospital. The maximum amount of services available each year is based on a budget approved by the Los Angeles County Board of Supervisors. The number of "budgeted beds" for a given fiscal year is an estimate of how far the budget will stretch, or how many beds the hospital can afford to supply with all the necessary services and goods for patient care.

County/USC had used budgeted beds for calculating its IME payment since 1986. For FYE June 30, 1994, however, Blue Cross determined that the cost report understated the number of beds physically available in the hospital's inpatient areas, and therefore increased the count. County/USC appealed to the PRRB. Prior to the evidentiary hearing, the parties stipulated that the number of beds physically located in the hospital during the FYE June 30, 1994 was 1,320 and that the number of budgeted beds was 1,197. Thus, 123 beds are at issue.

The PRRB concluded that Blue Cross properly used the number of physical beds located within County/USC's facility as a measure of the available beds. It found that the number of budgeted beds was not an absolute cap on bed utility because on any given day the budgeted cap of 1,197 may have

been exceeded. Finally, the Board found no evidence that County/USC closed floors or areas of the hospital.[6]

County/USC appealed to the Secretary, who declined review. The PRRB's decision thus became the final administrative action for purposes of federal jurisdiction. 42 U.S.C. § 1395oo(f) (1993). The Med Center sought review in the district court, which granted summary judgment in favor of the Secretary. This timely appeal followed.

## II

Judicial review of a decision of the PRRB is pursuant to the Administrative Procedures Act (APA). For this reason, we may not set aside its findings or conclusions unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E) (1966), or are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

Courts must defer to an administrative agency's reasonable construction of a statute unless Congress has spoken unambiguously. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984). "[A]n agency violates the APA if it has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U. S. Dept. of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto.*

---

[6]The PRRB also noted that County/USC was reimbursed for the capital costs of all 1,320 physical beds and concluded that it would be inconsistent for the provider to be reimbursed the capital costs of those beds but for them not to be included in computing the IME adjustment.

*Ins. Co.*, 463 U.S. 29, 43 (1983)). "Our task is not to decide which among several competing interpretations best serves the regulatory purpose." *Thomas Jefferson Univ.*, 512 U.S. at 512.

### III

**[1]** County/USC's principal argument is that it was arbitrary and capricious for the Secretary to move from using budgeted beds to using physical beds without an explanation. An agency is not precluded from changing its mind, *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993), but "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored . . . ." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (citations omitted). This rule has no application here, however, because it was *Blue Cross* that had approved County/USC's claims for IME reimbursement based on budgeted beds.[7] County/USC points to no decision by the PRRB or the Secretary that embraces a budgeted-bed approach, nor does it suggest that the Secretary has taken inconsistent litigation or rule-making positions on this issue. While a fiscal intermediary is the Secretary's agent for purposes of reviewing cost reports and making final determinations with respect to the total reimbursement due to a provider absent an appeal to the PRRB, *see Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1117 (9th Cir. 2003), intermediary interpretations are not binding on the Secretary, who alone makes policy. *See Loma Linda Univ. Med. Ctr. v. Leavitt*, 492 F.3d 1065, 1074 (9th Cir. 2007).

Recognizing that the Secretary has never explicitly taken a position that "available beds" may be measured by budgeted

---

[7]A Blue Cross representative testified at the PRRB hearing that Blue Cross had previously taken the budgeted bed number to be based on a physical survey of the hospital.

beds instead of physical beds, County/USC posits that he implicitly acceded to use of budgeted beds by virtue of Blue Cross' Bulletin. It reasons that since the Secretary knew that Blue Cross deemed beds to be "available" only when they could adequately be covered by nurses, it must have been a change in position to count the 123 beds at issue for FYE 1994 because nurses could not be hired over budget. No such inference arises, however, because the Bulletin's discussion about staffing pertains only to beds that are in rooms or floors that are temporarily unoccupied.

[2] Consequently, prior Blue Cross approvals based on a budgeted beds calculation did not make the Secretary's determination that the intermediary properly used a physical bed count for FYE 1994 arbitrary and capricious. Therefore, the Secretary's interpretation is entitled to no less deference on this account.[8]

IV

County/USC alternatively argues that, even if it were not arbitrary and capricious to change course, still it is arbitrary and capricious for the Secretary to reject budgeted beds in favor of a physical bed count. Med Center emphasizes that it is a publicly-funded hospital and submits that physical beds for which there is no budget for staffing, linen, dietary, pharmaceutical, and other resources should not be part of the measure of a hospital's routine inpatient operations for IME reimbursement purposes because such beds do not affect the teaching intensity. In addition, it contends that the Provider Reimbursement Manual contemplates day-to-day fluctuations

---

[8]In any event, as we have observed, "the consistency of the Secretary's position is one 'factor' in determining whether to accord deference . . . . '[W]here the agency's interpretation of a statute is at least as plausible as competing ones, there is little, if any, reason not to defer to its construction.' " *Queen of Angels/Hollywood Presbyterian Med. Ctr.*, 65 F.3d 1472, 1481 (9th Cir. 1995) (quoting *Good Samaritan*, 508 US at 417).

in usage, and that the legislative history and commentary to different Medicare adjustments that also depend on "available beds" — disproportionate share hospital (DSH) payments, and payments for rural referral centers — further indicate that beds must be staffed in order to qualify.[9] The PRRB considered each of these arguments, but concluded that while budgeted beds may be an appropriate vehicle to establish staffing levels and related ancillary and administrative activity, the number of budgeted beds cannot identify which beds were or were not available.

**[3]** The parties' disagreement boils down to whether the IME calculation must be *staff*-driven or may be *size*-driven. Said differently, the dispute turns on whether beds are a proxy for the number of *patients* (as County/USC would have it), or may stand-in for the number of *physicians*. The Secretary's judgment is that a facility's *size* is what relates to teaching load and that the best measure of this is the number of beds maintained for patient use. His rationale is that hospitals generally do not maintain beds they are unable to use. *See Little Co. of Mary*, 165 F.3d at 1164 (citing Medicare Program: Fiscal Year 1986 Changes to the Inpatient Hospital Prospective Payment System, 51 Fed. Reg. 16772, 16775 (May 6, 1986)). The Med Center counters that budgeted resources, particularly for nursing support, are the appropriate measure for publicly-funded hospitals, and that beds should be a proxy for the patients served.

---

[9] *See* 53 Fed.Reg. 38476, 38514 (stating for purposes of the rural referral center adjustment that the agency "will count only licensed beds actually available for use, that is, beds in place, staffed and available to receive patients for inpatient lodging."); S. Rep. No. 98-23 at 140, *reprinted in* 1983 U.S.C.C.A.N. 143, 359 (Mar. 11, 1983) (stating that the purpose of the IME payment is to compensate hospitals for increased demands on staff); 42 U.S.C. § 1395ww(d)(5)(F)(i)(II) (directing the Secretary to provide disproportionate share payments based on the number of "beds"); H. Rep. No. 99-241, Part I (July 31, 1985), *reprinted in* 1985 U.S.C.C.A.N. 579, 596 (indicating that beds should be staffed and available for purposes of calculating disproportionate share payments).

**[4]** No doubt the Secretary could have decided to measure "available beds" by counting nurses or patients had he thought this was sounder policy. However, if both his and County/USC's views are plausible, the Secretary's will prevail. *Thomas Jefferson*, 512 U.S. at 512. His view is reasonably grounded in the statutory scheme. All hospitals are subject to the PPS, and all teaching hospitals are eligible for the IME adjustment that Congress provides to hospitals with a graduate medical education program to account for greater costs per case. The assumption is that, across the universe of teaching hospitals (public as well as private), additional tests will be ordered to train residents and more nursing and medical teaching staff will be necessary to support the program. Congress chose to gauge the extra cost of the teaching load by reference to available beds rather than available staffing, so we cannot say that the Secretary unreasonably pegged the formula to an actual bed count rather than a budgeted bed count that turns on staffing.[10]

---

[10]Two other circuits (in addition to the Seventh Circuit's analysis) have concluded that beds are not to be counted as a proxy for patients, but as a proxy for size and doctors. *See Clark Reg'l Med. Ctr. v. U.S. Dept. of Health and Human Servs.*, 314 F.3d 241, 248-49 (6th Cir. 2002) (considering the regulation that provides a supplemental payment to "disproportionate share" hospitals based in part on bed size calculated in accordance with the IME payment scheme, and noting that the "day-to-day, or perhaps even hour-to-hour, change in the occupancy of these beds does not reflect the overall size of the Plaintiff hospitals, which is what the bed count is intended to capture."); *Altoona Hosp. v. Thompson*, 131 Fed. Appx. 355, 359 (3rd Cir. 2005) (noting that "Congress contemplated that the agency would count beds as a proxy not for the number of patients, as the Hospital suggests, but rather for the number of *doctors* at a given facility . . . . Presumably, Congress chose to tie the amount of reimbursement to the number of beds in a facility because a simple counting of the beds maintained for patient use would be less burdensome for the agency and, in all likelihood, less susceptible to manipulation by the hospitals. Given this understanding, it seems reasonable to do as the agency has done and decline to engraft staffing concerns onto the definition of 'available beds.' ") (emphasis in original).

**[5]** The Secretary's approach is consistent with the purpose of the IME adjustment, and with the Manual. Congress recognized that increased patient care costs associated with graduate medical education programs include "the additional tests and procedures ordered by residents as well as the extra demands placed on other staff as they participate in the education process," H.R. Rep. No. 98-25, pt. 1, at 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 359, but left the task of defining "available beds" in "the ratio of the number of interns and residents . . . to the hospital's available beds" to the Secretary. The regulation promulgated by the Secretary opted to count the number of available bed days (excluding certain types of beds) and divide that number by 365 (for most years). The PRM added the refinement that, to be considered "available," a bed must be "permanently maintained for lodging inpatients," and that all such beds, i.e, all beds that are physically present in the hospital and permanently maintained for use in treating patients at any time during the year, are treated as presumptively available for the entire period for purposes of calculating the IME payment. (Hospitals may show that some of their beds are not in fact available and should be excluded.) With the presumption that a bed available once is available always, the number of available bed days is equal to 365 times the number of physical beds. Dividing this product by the number of days in the accounting period gets back to the number of physical beds. In this way, the Manual links the count of available bed days specified in the regulation and the physical count that the Secretary condoned in this case.

County/USC relies on one statement in the PRM — "[t]he term 'available beds' as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards" — to argue that it was irrational for the Secretary to reject the use of budgeted beds on the basis that the budgeted-bed cap could be exceeded on any given day, because a single day's fluctuation is not what the regulation is intended to do. But the statement upon which it relies

in isolation carries no such weight, for the Manual goes on to explain that the count *is* intended "to capture changes in the size of a facility as beds are added to or taken out of service." This squares with the Secretary's interpretation.

Nor are we persuaded that the Secretary's reasoning is undermined by references to staffing in the legislative history. For one thing, Congress explicitly delegated a definition of "available beds" to the Secretary which, presumably, it would not have done had it intended the concept to turn on "available staffing." Beyond this, the Secretary could sensibly conclude that staffing concerns are effectively accounted for within the adjustment itself. That teaching hospitals incur more indirect costs than non-teaching hospitals — including for staff support — is the reason for additional reimbursement by way of the IME payment; it is not conversely a requirement that the reimbursement be further increased when some of these costs are not in the budget of a particular hospital.

Finally, neither Congressional direction in establishing DSH payments nor commentary to the rural referral regulation casts doubt on the reasonableness of the Secretary's decision to count physical beds for purposes of the IME payment. Both the DSH regulation and the rural referral regulation incorporate the IME definition of "available beds," not the other way around. *See Clark Reg'l Med. Ctr.*, 314 F.3d at 246-47 (indicating that the definition of beds for purposes of the IME adjustment in PRM § 2405.3(G) applies to the DSH payment).

**[6]** Given that the Secretary's interpretation of "available beds" for purposes of the IME payment is reasonable, the remaining question is whether the PRRB's application to County/USC is arbitrary and capricious. The PRRB found that County/USC's budgeted beds calculus was a proxy for services, not size; and that the budget did not establish a ceiling on bed availability, but was instead a proxy for the *average* number of beds available *on a daily census* that does not

identify which beds were or were not available. County/USC submits that, to the contrary, the budgeted beds figure is a static figure representing the maximum amount of hospital resources allocated to inpatient care. We conclude that substantial evidence supports the PRRB's finding.

**[7]** Med Center does not dispute that the 123 beds at issue were used for patient care from time to time and could be so used whenever needed. These beds were plugged in and ready to go. They were not taken out of service, or located in an area that was closed, temporarily or permanently. They were, in short, "maintained for lodging inpatients."

**[8]** Testimony by county administrators indicates that the budgeted-beds figure is used to monitor the hospital's performance against the budget during the year; it is "a proxy for the nursing care and the dietary and linen contract that we'd have to spend out money on," or put otherwise, "the number of inpatient days that we can provide." There was testimony, as well, that County/USC cannot provide care beyond its budgeted-bed figure, that its emergency rooms are frequently saturated, and that if the hospital operates over budget during one time period it must reduce spending later. However, the evidence shows that "budgeted beds" does not mean that beds are not available for patient care on any given day. As one administrator testified, the budgeted bed total has nothing to do with the physical capacity (number of mattresses) at Med Center that can be pressed into service when needed. This being so, the PRRB was not compelled to find that the nature of Med Center's budget limitations or its status as a public hospital excluded any physical beds from being available at any time during the cost reporting period.

**[9]** As neither the Secretary's interpretation of "available beds" nor his application to County/USC's proffered exclusion of beds in excess of those budgeted is arbitrary or capricious, we affirm.

AFFIRMED.

---

REINHARDT, Circuit Judge, dissenting:

I agree with the majority that the Secretary did not act arbitrarily and capriciously when he switched from using the number of budgeted beds to using the number of physical beds for calculating the Medicare IME adjustment. I also agree that the Secretary's interpretation of "available beds" as presumptively meaning physical beds is entitled to deference from this court and is reasonable as a general matter. However, because I believe that County/USC met its burden of rebutting the presumption and showing that certain beds should have been excluded from Med Center's available bed count in the fiscal year ending June 30, 1994 ("FY1994) — namely the 123 beds that made up the difference between the number of physical beds and the number of budgeted beds — I would hold that the Provider Reimbursement Review Board's ("Board") decision was arbitrary and capricious.

As the majority explains, the relevant interpretive regulation directs that "beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting period." PRM-1 § 2405.3; Maj. Op. at 3231. However the majority relegates to a parenthetical a crucial caveat: hospitals may provide "evidence to the contrary" in order to "exclude beds from the count." *Id.* In other words, hospitals have the opportunity to prove that certain beds should not be considered available and thus should be excluded from the count. At a hearing before the Board, County/USC presented evidence that the 123 physical beds that were not included in the budget should be excluded from the IME calculation because those beds were not actually available for patient use during the year. Disregarding the substantial evidence presented by County/USC, the Board concluded that all 1,320 physical beds should be considered

available beds and denied County/USC's request to adjust the figure. Thus, the issue in this case is not whether the Secretary's interpretation of the term "available beds" as presumptively meaning physical beds instead of budgeted beds is arbitrary and capricious, but rather whether the Board's ruling that County/USC did not meet its burden of showing that the physical beds that were not budgeted for were not actually available and thus should be excluded from the count.

I

At the hearing before the Board, County/USC presented substantial evidence that in FY1994, Med Center did not actually use any of the extra physical beds that were not included in the budgeted beds figure. According to the Chief Financial Officer of Med Center, there was not a single day that the hospital had the resources to staff all of the budgeted beds to say nothing of the physical beds. He testified that the average number of beds that were actually available in the relevant year was 1,056, and that that number could vary on any given day by 50. Therefore, on the busiest days of the year, Med Center had only 1,106 beds available for patient care. If anything, the 1,197 budgeted beds that County/USC seeks to use as the available bed figure is too *high*, not too low. If the budgeted beds figure is too high, then the 1,320 physical bed figure that the Secretary proposes is certainly too high. With this testimony alone, County/USC more than met its burden of proving that the 1,197 budgeted beds was a more accurate count of available beds in FY1994 than the 1,320 physical beds.

Even counsel for the Secretary admitted during the hearing that in the relevant year "there's a fair cushion between the amount that the hospital calls budgeted beds and what its census was." He stated that the question of whether the hospital could actually use the *physical* beds that were not included in the budgeted bed count was "hypothetical" and "abstract"

because actual data indicates that the hospital did not even use all of the *budgeted* beds that year.

The Board's decision did not discuss or acknowledge the strong testimony County/USC offered. Instead, it found that "[t]he provider had 1,320 beds available, and on any given day its budgeted cap of 1,197 may have been exceeded." In light of the CFO's undisputed testimony and the admission of the Secretary's own lawyer that the budgeted cap was never actually exceeded, it is apparent that the " 'explanation for [the Board's] decision runs counter to the evidence before the agency.' " *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. United States Dept. of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). On that basis, I would hold that the Board's decision was arbitrary and capricious under that APA.

II

In addition to holding that County/USC met its burden of showing that the budgeted beds figure more accurately reflected the actual number of available beds at Med Center in FY1994 than the physical beds figure, I would also hold that County/USC offered sufficient proof that budgeted beds is the appropriate figure to use to measure available beds at Med Center as a general rule.

The Board's findings and decision to use the physical bed count to calculate Med Center's IME adjustment ran counter to the evidence presented by County/USC at the hearing. First, the Board found that County/USC stipulated that Med Center had 1,320 beds "available for patient care" and that this was "the strongest argument that this number is appropriate for the IME calculation." The Stipulation does not support the Board's finding. The Stipulation states: "For the fiscal year ended June 30, 1994 . . . the *Intermediary* agrees to revise the Provider's indirect medical education ("IME") pay-

ment amount using 1320 beds in the ratio of interns and residents-to-beds." (emphasis added). The reason that it was the *Intermediary* (Blue Cross) that stipulated to this number — instead of *County/USC*, as the board claims — is that Blue Cross originally sought to use the full count of licensed beds at Med Center, which was 2,045, but later agreed to lower that number to 1320 after County/USC demonstrated that some of those licensed beds could not be considered for the purposes of the IME calculation. The stipulation binds Blue Cross to a lower bed count number than it originally proposed. It does not represent, as the Board suggests, a concession on the part of County/USC that 1,320 is the appropriate number of beds to use for the IME calculation. In fact, the Stipulation clarifies that it "only partially settles the IME bed count issue that is still pending at the PRRB" — that is, the discrepancy between physical beds and actual beds that is now before us. Additionally, there is nothing in the Stipulation that discusses whether the beds were "available for patient care" and County/USC certainly did not stipulate that they were, as the Board found.

The majority does not discuss the Board's finding on this issue despite the fact that the Board considered it the "strongest argument" for using the number of physical beds instead of the number of budgeted beds. Because the Board's finding clearly "runs counter to the evidence before [it]," I would hold that it was arbitrary and capricious in violation of the APA. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of America*, 499 F.3d at 1115.

Next, the Board found that the budgeted beds count was an appropriate figure to use for planning staffing numbers and other administrative purposes, but that it did not constitute "an absolute cap on bed utility." However, the evidence before the Board proved that the budgeted beds figure did serve as a limit to the number of beds available for use at Med Center.

According to testimony presented by County/USC, the term "budgeted beds" connotes how much "staff, materials and

supplies, pharmaceuticals, support is available to provide care and . . . sets a ceiling for the operational capacity of the organization." Plainly stated, the budgeted beds figure "sets a cap on the capability of the organization to deliver safe, appropriate patient care." Because the "budgeted beds" figure is "a proxy for the nursing care and the dietary and linen contracts," the number of budgeted beds represents "the number of inpatient days" Med Center can provide. In fact, County/ USC monitors the bed count "every single day" and any deviations are immediately corrected.

County/USC also presented testimony that, unlike a private hospital in which the budget functions as a "floor" for planning purposes and can be expanded to accommodate increased demand or emergencies, the budget for Med Center "is really a ceiling." Med Center's budget is determined by the Los Angeles County Board of Supervisors and cannot be altered during the year. The section head of the Controller's Division responsible for the hospital's budget team testified that in his ten to fifteen years of experience, he did not recall a hospital ever getting the number of budged beds adjusted during the year.

Ignoring the extensive testimony to the contrary, the majority nevertheless argues that the physical beds that were not budgeted were available because they were "plugged in and ready to go." Maj. Op. at 3233. This is not so. They're not even "fired up and ready to go." Med Center's CFO testified that a bed is only available when "there's a physical bed that meets the needs of the patient and there is staff to operate them." A bed that does not have staff, linens, or food is no more available for use by a patient than the painting on the wall. If there is an empty bed, "plugged in" or not, but no nurses to staff it, a "patient would have to wait in the Emergency Room until such time as the bed became available to transfer him or her." Once the Emergency Room is saturated, patients are turned away rather than put in the empty beds that fall outside of the budgeted number. In other words, the phys-

ical beds are not necessarily available. Only those beds that are budgeted for can reasonably be considered available. Thus, the budget serves as a fixed cap on bed utility.

Although one hospital official testified that from a budgetary perspective, it was "marginally" possible to provide inpatient hospital care in more beds than the budget provides, such a scenario would be almost impossible. If the hospital could save money in another area, or if every patient who came to the hospital required only a low cost service, or if there were a sudden increase in paying patients, it might be possible to "bump up" the number of beds by the end of the year to "operate a few more." There are so many fixed variables in the "budgeted beds" figure, however, that "it would be very difficult to increase the number of beds that [Med Center] operate[s] on the basis of those changes." Additionally, on any given day the number of available beds could theoretically exceed the number of budgeted beds, but that increase would have to be balanced out by a proportional decrease later in the year. As discussed above, this did not actually happen on any day in FY 1994 — and the figure for budgeted beds has never been altered in the ten to fifteen years that the head of the responsible Controller's Division has been at County/USC.

The majority characterizes the parties' disagreement as being whether the IME calculation should be based on the staffing level of the hospital or the size of the hospital. Maj. Op. at 3229-30. According to the majority, the Secretary reasonably chose to base the calculation on the size of the hospital, not, as County/USC advocated, on "a budgeted bed count that turns on staffing." Maj. Op at 3230. This analysis misses the point. The budgeted bed count does not "turn[ ] on staffing." Maj. Op. at 3230. Just the reverse — the level of staffing turns on the number of budgeted beds. Similarly, the number of beds available for patient care (i.e. the size or capacity of the hospital) is at most the number of budgeted beds.

This is not true of all hospitals. The staffing levels of private hospitals are not limited by the number of budgeted beds. When a private hospital experiences an unexpectedly busy year, its revenues increase along with its patient census because private hospitals treat many more paying and insured patients. The hospital then uses those unanticipated revenues to hire additional staff and provide the services necessary to transform a physical bed into an available bed, thereby increasing the capacity of the hospital. Thus, the number of budgeted beds does not provide a limit on the staffing levels or the number of available beds because both can be increased during the year. The physical bed count is the only accurate measure of a private hospital's size. At Med Center, however, the budget limits the staffing level *and* the size of the hospital (the number of available beds). Consequently, at Med Center, there is no meaningful distinction between the size or capacity and the level of staffing because both are fixed by the same figure — the number of budgeted beds. Distinguishing between the size and the level of staffing or the number of budgeted beds at Med Center was arbitrary and capricious.[1]

Furthermore, the Board found that "there was no evidence

---

[1]Indeed, this crucial distinction between the function of Med Center's budget and that of a private hospital also explains why *Altoona Hosp. v. Thompson,* 131 Fed. Appx. 355 (3rd Cir. 2005), is not relevant to this case. *Altoona* involved a private hospital that argued that some of its physical beds should not be included in the IME adjustment calculation because they were not able to be staffed within 24-48 hours. *Id.* at 356. However, the hospital admitted that it kept the beds because there was "a potential for an increase in patient census" and it "hoped to gain market share." *Id.* Thus, staffing levels at Altoona Hospital did not determine the size of the hospital. At Med Center, however, the size of the hospital and the staffing level are coterminous. *Clark Reg'l Med. Ctr. v. Dept. of Health and Human Servs.*, 314 F.3d 241 (6th Cir. 2002), is also inapposite. That case involved the question of whether beds that were used for two purposes should be counted when the regulation excluded one of the purposes from the calculation. Unlike the unbudgeted physical beds in this case, the beds in question at Clark Regional Medical Center were "always staffed and available for acute case inpatients." *Id.* at 248.

that the Provider closed off various floors or areas of the hospital." The majority asserts the same. Maj. Op. at 3233. This is true as a factual matter, but it should not have any effect on the outcome of the case. The interpretive regulation refers to closed wings as an example of one situation in which a bed would not be considered "available for use and housed in patient rooms or wards." PRM, §2405.3G. The regulation never directs that a bed will be considered available *unless* it is kept in a closed wing. Although some hospitals may well have to place unused beds in a closed ward in order to prove that they are not available, Med Center presented substantial evidence that the physical beds that were not included in the budget were not available for patient care. Requiring the hospital to move those beds to a closed ward would be unreasonable as there are 123 physical beds that will necessarily remain unused for the entire year, it is immaterial whether the area in which they are placed is closed off physically. The interpretive regulation does not mandate that the only way to exclude physical beds from the count is to move them to a closed ward and the Board's determination that such a requirement applied in all cases was arbitrary and capricious.

The Board and the majority also argue that the budgeted beds figure did not indicate which beds were available and which beds were not. Again, I fail to see how identifying which particular beds are available and which are not makes any difference in determining the size of the hospital for the purpose of the IME adjustment. Neither the majority nor the Board provide an explanation.

Finally, the Board found that because Med Center "was reimbursed capital costs" for the 1,320 physical beds, "it would be inconsistent" for Med Center "not to include those beds in computing the Provider's IME adjustment." The Board does not specify which capital costs would be reimbursed based on the number of physical beds, nor does the Board explain how capital cost reimbursement relates to bed availability.

The Chairman of the Board questioned the CFO about the issue of capital costs. According to the CFO, the hospital files its cost reports based on the number of budgeted beds not the number of physical beds. Even the Chairman acknowledged that "the building cost is the same whether there's [sic] 1300 or 1500" beds. The only other capital cost that the Board could possibly be referring to that was discussed at the hearing was depreciation, but, as the CFO testified, "[d]epreciation is not based on the number of beds that's [sic] in use." There is no evidence in the record that the hospital was receiving extra reimbursement money for capital costs because it had a number of physical beds that were not available for use. The Board's finding on this issue is not supported by the evidence.

Even if the unavailable physical beds did qualify Med Center for additional capital costs, this fact would be irrelevant to the available bed count for the purpose of the IME adjustment. There are many beds that are not included in the available bed figure that presumably the hospital is reimbursed for, including the bassinets and psychiatric beds that the regulations expressly exclude from the IME count. The purpose of the IME adjustment is to reimburse hospitals for the costs involved in treating patients while also teaching medical students. The number of available beds is relevant because it reflects the workload of actual doctors working with actual patients. Whether or not a physical bed entitles the hospital to receive additional reimbursement for capital costs is irrelevant to that calculation. I would hold that the Board's finding on this issue was arbitrary and capricious because it was not supported by the evidence and it was irrelevant to the question before it.

## Conclusion

Although the Secretary's adopted presumption about the appropriate figure to use in calculating "available beds" is entitled to deference from this court, the Board is not permit-

ted to impose that presumption categorically without regard to the evidence before it. Because I believe that County/USC more than met its burden of proving that the physical beds at Med Center that were not in the budget appropriation were not available for the any portion of FY1994 and thus should be excluded from the bed count used to determine the IME adjustment, I would hold that the Board acted arbitrarily and capriciously when it held the opposite. Therefore I respectfully dissent.